MEMORANDUM OF DECISION
This is an action for termination of parental rights brought by the Commissioner of the Department of Children and Families (DCF). DCF is seeking to terminate the parental rights of the biological mother, Linda C. and the biological father, Thomas D. CT Page 5799
PROCEDURAL BACKGROUND
On May 25, 1995, DCF filed neglect petitions alleging that Thomas (TJ) and two of his siblings were neglected in that the children had been permitted to live under conditions, circumstances or associations injurious to their well-being and that TJ was uncared for in that he had special needs that were not being addressed in his mother's home.[2]
On September 19, 1995, the court adjudicated TJ neglected and committed him to the care and custody of DCF.
On December 12, 1997, DCF filed a petition for termination of parental rights of the respondent parents. With regard to Linda, the petitioner alleged that TJ had been abandoned in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Conn. Gen. Stat. § 17a-112
(c)(3)(A). The petitioner also alleged that there is no ongoing parent-child relationship with the mother that ordinarily develops as a result of a parent having met on a continuing basis the physical, emotional, moral or educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.Conn. Gen. Stat. § 17a-112 (3)(c)(D). The petitioner also alleged that the child had been found in a prior proceeding to have been neglected and the mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the needs and age of the child, she could assume a responsible position in the life of the child. Conn. Gen. Stat. §17a-112 (c)(3)(B).
With regard to the respondent father, Thomas D., the petitioner alleged that there is no ongoing parent-child relationship with the father that ordinarily develops as a result of a parent having met on a continuing basis, the physical, emotional, moral, or educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112
(c)(3)(D). The petitioner also alleged that the child had been abandoned in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.Conn. Gen. Stat. § 17a-112 (c)(3)(A). The petitioner also alleged that the child had been found in a prior proceeding to have been neglected and the father had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the needs and age of the child, he could assume a CT Page 5800 responsible position in the life of the child. Conn. Gen. Stat. §17a-112 (c)(3)(B).
On February 5, 1999, DCF withdrew the ground of no ongoing parent-child relationship with respect to both parents. On February 11, 1999, DCF also withdrew the ground of abandonment with respect to the mother.
On February 17, 1999, the court found that continuing efforts to reunite the family were no longer appropriate with regard to both parents and on February 16, 2000, the court stated that it was not going to disturb this finding.
In June of 1999, a termination of parental rights trial was commenced regarding TJ and his siblings. With regard to TJ, the trial was suspended and ultimately a mistrial was declared.
On June 18, 1999, the court (Munro, J.) entered the following order:
 ORDER Pursuant to the highlighted portions of the attached agreement, the Court orders DCF to provide intensive reunification services for TJ and the respondent mother; DCF shall utilize the services of the Yale Child Study Center to work with foster mother, biological mother and TJ toward the goal of reunification. Respondent mother is to cooperate with the provisions of these services.
 Further, the court orders an independent psychological evaluation of TJ and his biological mother for the purposes therein stated in the copy of the agreement. It is to be accomplished in approximately 90 days.
 The Court finds that DCF had decided to foster reunification between the mother and TJ in Spring, 1999. The court further finds that TJ's present psychological state of trauma in his relationship with his mother is a direct result of his having been informed by his foster mother of the pending reunification. The child was not properly supported before this information was shared with him. The Court finds this was not willful. The court further finds that repair of this trauma must first occur CT Page 5801 before a renewal effort of reunification may be expected to have any hope of succeeding. The court orders DCF to provide all necessary therapeutic support for TJ.
Trial as to TJ is suspended.
On March 29, 2000, a new trial regarding TJ commenced on the petition to terminate the parental rights of Thomas and Linda. On that date, counsel for DCF orally amended the termination petition regarding the father setting forth as grounds for termination, abandonment, no ongoing parent-child relationship and failure to rehabilitate. With regard to the mother, DCF alleged no ongoing parent-child relationship. The Assistant Attorney General initially stated that the parties agreed that the relevant adjudicatory date should be December 12, 1997. During the second day of trial, the Assistant Attorney General moved that the court find that the relevant adjudicatory date should be March 29, 2000, based on the amendment to the petition that had been granted that day. While counsel for mother objected to this motion, he also candidly admitted that before the trial commenced he had assumed that the relevant adjudicatory date would be March 29, 2000.
Based on Practice Book sections 35-1 and 33-3, as well as the best interest of the child, the court granted this motion. Based on this decision, the court suspended trial in order to give counsel adequate time to prepare and also ruled that mother's counsel would be free to recall any witnesses that had already testified. The trial was completed on May 9, 2000.
Thomas D. did not appear for trial despite having notice of the proceedings and having counsel appointed for him. Counsel for father cross-examined witnesses called by the other parties.
For the reasons stated below, the court hereby terminates the parental rights of Linda C. and Thomas D.
FACTUAL FINDINGS
The court makes the following findings by clear and convincing evidence.
TJ has resided in the same foster home since he was eighteen months of age. He is now six years old. The foster family that he is placed with initially did not plan to adopt him. However, he has now lived with this family for over four years and all of the family has deep love and affection for TJ. Accordingly, the foster family would like to adopt TJ and offer him a permanent home. He is extremely bonded to his foster CT Page 5802 family and identifies his foster parents as "Mom" and "Dad." He is currently a kindergarten student.
Between March 1, 1996 and March 1, 1997, Linda only visited with TJ twice. Because she was still struggling with her own issues, she was not available to her child from the time he turned two until he turned three. In 1997 she began visiting more regularly. As of the time of trial, Linda has not used drugs for over two years and has a full time job. She has maintained regular visitation and has been appropriate at all visits with TJ.
Without considering TJ's attachment to his foster family, in April of 1999, the Department increased visits between TJ and his mother in an effort to explore the possibility of reunification. Around the same time, TJ was told by his foster mother that DCF was working towards returning him to his mother's care now that she was no longer sick. At this point, TJ's behavior changed dramatically. He began experiencing nightmares and on May 5, 1999, he bolted and almost ran into the street when he was picked up for a visit. On several occasions, he hid in his home crying and screaming in an attempt to avoid visiting with his mother. He also engaged in regressive behavior including bed-wetting and speaking like a baby. After nine visits TJ refused to visit his mother on May 12, 1999. At that point, the reunification effort was stopped because of TJ's escalating behavior and acting out.
As a result of the June 18, 1999 court order, DCF again attempted reunification in June of 1999. John Buchbinder, a clinical social worker at Yale, began working with TJ to assess the possibility of reunification. He found the child was becoming increasingly agitated and was engaging in regressive behavior including banging his head against a fence. He came to the conclusion after working with the child for six weeks that reunification efforts were detrimental to the child. At trial, he testified that he believes that reunification could not be achieved because TJ had a quality caregiver for such a long period of time. He also does not believe that counseling would have changed TJ's strong desire to be with his foster mother, or that therapy would have helped with the reunification effort.
On July 28, 1999, TJ awakened several times throughout the night before a planned visit, wet himself and slept at the foot of his foster parents' bed. As the worker prepared to take the child to the visit, TJ began acting like an animal. He hid under the dining room table and resorted to baby talk. He also curled up in a fetal position on the floor.
At the beginning of August of 1999, DCF decided to cease the second CT Page 5803 reunification effort based on TJ's regressive behavior and emotional turmoil. TJ continued to visit with his mother, however, and continued to meet with Mr. Buchbinder.
On August 18, 1999, the DCF social worker visited TJ's foster home. He again talked to the worker in baby talk and ignored her questions. The foster mother reported that he had told his biological mother during a previous visit not to come back for another visit and that he never wanted to see her again.
TJ began to engage in counseling with Martha Morris in October of 1999, to address the trauma that he was clearly suffering from. Specifically, he was referred for counseling to address regressive behaviors including baby talk, night terrors, bed wetting, acting out in school, and significant difficulty separating from his foster mother. Ms. Morris has noticed an improvement in TJ since visits with his mother stopped in November of 1999. She testified that while he is now almost a totally "normal kid," she has serious concerns if a decision is made to return him to his mother. She described the major stress in this child's life as being the threat of losing his foster mother. She believes if this happened, his regressive behavior and acting out would resurface. Most importantly, she does not believe that reunification could be achieved through counseling.
TJ is described by everyone that knows him as a strong-willed child. During the failed reunification efforts and afterwards, TJ repeatedly told anyone who would listen that he wanted to stay with his foster family and that he does not want to live with his mother. Specifically, he repeatedly told his biological mother, his foster mother, DCF workers, John Buchbinder, his therapist, Martha Morris, and Dr. John Collins, that he did not want to live with his mother.
TJ's mother recognizes that TJ felt threatened by her desire to have him live with her. She described the visits as very hard once he learned of the reunification efforts. Sadly, she described a child that would no longer hug her and would not allow her to hug him. Because the ongoing visits that were scheduled between TJ and his mother were so unsettling to TJ, Linda voluntarily decided in November of 1999 that she would not visit with TJ until his anxiety level had decreased.
On November 30, 1999, TJ informed his social worker that his mother had told him he could live with the foster family forever. When asked if he wanted to continue to see his mother, he said, "No."
At Linda's request, DCF attempted to conduct two visits in February of 2000 with TJ. TJ refused on both occasions to go to the visits. CT Page 5804
Dr. Julia Grenier performed a psychological evaluation and update regarding TJ and his mother. She testified that as a result of her second evaluation of TJ in May of 1999, she does not believe that TJ had an emotional attachment to his mother and does not have any memories of any positive interactions with her.
Dr. John Collins evaluated TJ and his mother in the early fall of 1999. He found that after spending the last fifty-one of the sixty-nine months of life with his foster family, TJ is firmly bonded to his foster family and views them as his psychological parents.
He described TJ as ". . . a child with a mission. His mission is to tell anyone in any way that he can, that he does not want to live with his biological mother." He testified that TJ's mother is a primary source of anxiety to TJ and that he is threatened by her attempt to seek reunification. Dr. Collins also testified that TJ desperately wants to stay with his foster family and that Linda recognizes that reunification would be traumatic to TJ.
Thomas D. was convicted in 1997 on a burglary charge. He is currently not in compliance with his probation conditions and there is a warrant out for his arrest. He has not completed a drug program and has continued to test positive for drugs.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that this parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The court need not make such a finding, however, if a court has determined at a hearing pursuant to subsection (b) of § 17a-110 that such efforts are not appropriate. On February 17, 1999, the court made the requisite finding that further efforts to reunify the parents with their child were not appropriate.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In CT Page 5805 this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. Practice Book § 33-3
(a). The relevant date in this case is March 29, 2000.
FAILURE TO REHABILITATE
"A statutory ground for termination arises when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen.Stat. § 17a-112 (c)(3)(B). This statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C., 210 Conn. 157, 167
(1989).
No dispute exists that this court has previously found TJ to have been neglected, thus satisfying a statutory prerequisite.
Thomas D. did not appear for trial. He is currently in violation of his probation conditions and there is an outstanding warrant for his arrest. For all these reasons, the court finds by clear and convincing evidence that Thomas D. has failed to rehabilitate within the meaning of the statute and that rehabilitation is not foreseeable within a reasonable time.
NO ONGOING PARENT/CHILD RELATIONSHIP
Petitioner also alleges that Linda C. and Thomas D. have no ongoing parent/child relationship that ordinarily develops as the result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. §17a-112 (c)(3)(D). The Connecticut Supreme Court in In re Jessica M.,217 Conn. 459 (1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the natural parent" or that if such child does have some memories, "no positive emotional aspects of the relationship survive." Id. at 468-70.
Dr. Julia Grenier found that as of May 1999, TJ no longer had an emotional attachment to his mother and that he does not have memories of positive interactions with her. CT Page 5806
The relevant facts in this case are strikingly similar to In re MeganM., 24 Conn. App. 338 (1991), a case in which the mother had rehabilitated but the child had strong feelings about wanting to remain with her foster family. "In determining whether there is no ongoing parent-child relationship the court should consider the feelings of the child towards the parent especially if those feelings are positive rather than negative." In re Megan M., Supra, at 341. TJ is described by all that know him as a strong-willed boy. This child has made abundantly clear to the clinicians that observed him and the experts that evaluated him, that no positive emotional aspects of the relationship with his mother survive. Based on all of the evidence presented, the court finds by clear and convincing evidence that TJ has no ongoing parent/child relationship with his mother.
Because the court has determined that no parent/child relationship exists, it must next consider whether to allow further time to develop such a relationship would be detrimental to the best interest of the child.
"There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children'sServices, supra, 458 U.S. 502, 513 (1982). This is especially true in this case where it is clear that there is no possibility of TJ having any sort of positive relationship with his biological mother until he is adopted by his foster family. Therefore, to allows further time for TJ and his mother to develop a relationship would be not only detrimental but also futile.
With regard to Thomas D., Dr. Grenier found in 1998 that the father had not seen the child since 1995 and that TJ did not view his father as his psychological parent. She stated that for a positive relationship to be developed they would need time and some on-going contact. Thomas D. has not seen TJ since March of 1999 and saw him only sporadically prior to that. For all of these reasons, the court finds by clear and convincing evidence that there is no ongoing parent child relationship between TJ and his father and that to allow further time would be detrimental to the child's best interest.
For all the foregoing reasons, the court finds by clear and convincing evidence that TJ has no ongoing parent/child relationship with his parents within the meaning of the statute.
ABANDONMENT
CT Page 5807
Conn. Gen. Stat. § 17a-112 (c)(3)(A) provides that a ground for termination exists when "the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." "Attempts to achieve contact with the child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." Inre Migdalia, 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809
(1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209.
With regard to Thomas D., the court finds by clear and convincing evidence that this father abandoned his child. "There are five general obligations to parenthood: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to provide social and religious guidance." In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 14 (1981). Thomas D. has never supplied food, clothing, medical care or an adequate domicile for this child. While he has sporadically visited with the child there has been no "continuing reasonable degree of concern." In re Migdalia,6 Conn. App. 194, 210 (1986). The court finds that Thomas D. has abandoned the child within the meaning of the statute.
MANDATORY FINDINGS
With respect to the mandatory factual findings required by Conn. Gen.Stat. § 17a-112 (d), except in the case where termination is based on consent, the court makes the following findings:
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
The court finds that DCF provided timely and appropriate services with one exception. DCF should have immediately placed TJ in counseling when it was ordered to do so on June 18, 1999, by Judge Munro as part of a reunification effort. However, the court finds, with the benefit of hindsight, that even if this service had been provided the reunification effort would have been a failure. TJ had far too strong of a bond with his foster family for reunification with his mother to have been a possibility. In fact, it makes no sense to this court that a reunification effort was attempted in the spring of 1999, after the CT Page 5808 child had lived with the same loving and nurturing family for four
years. By March of 1999, TJ was no longer waiting for DCF or a court to make a determination about his fate. He had already firmly and forever adopted his foster family.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
As discussed in the foregoing paragraph, the court finds that DCF made reasonable efforts to reunite the parents with TJ, and that the efforts to achieve reunification in 1999 should never have been attempted.
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
DCF did comply with the stipulated agreement dated June 17, 1999 which was incorporated by reference into the June 18, 1999 Order entered by Judge Munro. DCF did not comply with the Order dated June 18, 1999 to the extent that it required immediate counseling for TJ.
4. The feelings and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties.
TJ is firmly bonded with his foster family. He has no positive emotional attachment with his mother currently. He does not have an emotional attachment with his father,
5. Ages of the children.
TJ is six years old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (a) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to the incidental visitations, communications, contributions, (b) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Since her recovery began in 1997, Linda has done everything she could to make it possible for her to be reunited with her child. CT Page 5809
Thomas D. has engaged in sporadic visitation but has not seen TJ since March of 1999. He has not taken any of the other steps necessary for reunification to be a possibility.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
DCF has not engaged in any unreasonable conduct that prevented Linda or Thomas from maintaining a relationship with TJ.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat.
§ 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book §33-5.
The court finds by clear and convincing evidence that it is in TJ's best interests for a termination of parental rights to enter with respect to Linda C. and Thomas D.
TJ deserves permanency and it is clearly in his best interest to terminate the parental rights of Linda and Thomas in order to allow him to be adopted by his foster family.
Accordingly, a termination of parental rights of Linda C. and Thomas D. is ordered. It is further ordered that the Commissioner of DCF be appointed statutory parent for this child for the purpose of securing an adoptive home. The Commissioner shall file with this court no later than 60 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.[3]
 CHASE T. ROGERS JUDGE OF THE SUPERIOR COURT